Donald Ray DAWSON, Appellant *v.* TEMPS PLUS, INC.,
Appellee; Temps Plus, Inc., Cross-Appellant *v.*
Donald Ray Dawson, Steve Dawson, Linda Ramsey, Melissa Trout,
and Steve Dawson Employment Service, Cross-Appellees

98-866                                    987 S.W.2d 722

Supreme Court of Arkansas
Opinion delivered April 15, 1999
[Petition for rehearing denied May 20, 1999.]

248

*Reid, Burge, Prevallet & Coleman,* by: *Dan M. Burge,* for appellant.

*Daniel G. Ritchey,* for appellee/cross-appellant.

R OBERT L. BROWN, Justice. Appellant Donald Ray Dawson appeals a judgment against him in the amount of $62,228.97 for breach of a covenant not to compete entered into with appellee Temps Plus, Inc., as well as intentional interference with contractual relationships and civil conspiracy. He contends on appeal that the covenant not to compete is invalid and not enforceable. Moreover, he contends that even if the covenant is valid, there was no breach and, alternatively, that no damages flowed from the breach. He further appeals from an award of attorney's fees in the amount of $20,270.00 and claims that the award is excessive. We agree with the trial court that the covenant not to compete was valid and enforceable and that it was breached by Donald Ray Dawson. But we disagree with the trial court that Temps Plus proved any damages flowing from that breach. We further hold that the award of attorney's fees is excessive, and we remand for reconsideration of that award in light of this opinion. Finally, we affirm the trial court's decision to deny Temps Plus's request to extend the injunction for breach of the non-compete agreement to the cross-appellees.

In 1994, Peggy Lemons was a former temporary employment agency employee living in Blytheville who wanted to start her own temporary-employment business. Because she did not have sufficient capital to do so, she invited appellant Donald Ray Dawson to invest in her business, Temps Plus, Inc., and he agreed. He purchased 49% of the issued stock for Temps Plus for $4,900 and loaned Lemons $35,100 on an unsecured promissory note, for a total investment of $40,000. Lemons purchased 51% of the stock of Temps Plus. The company was officially incorporated in June of 1994, and Lemons, as the incorporator, president, and general manager, began operating the business. Dawson was not involved in the day-to-day business operations although he was a member of the board of directors. He was never paid dividends, salary, or bonuses of any sort. The business was successful, and Lemons made plans to expand Temps Plus into South Carolina. Dawson did not approve of the out-of-state expansion, and he began negotiations with Lemons to sell his interest in the corporation.

In May of 1996, Temps Plus paid Dawson $95,000 for his forty-nine shares of stock in the corporation. The buyout sum included the balance due on the $35,100 promissory note and the $4,900 purchase price for the stock. As part of the stock sale, Dawson signed a receipt that included this language: "As part of the payment received by Donald Ray Dawson, and as additional consideration of this Agreement, Donald Ray Dawson agrees, that for a period of five (5) years from the execution of this Agreement, he will not directly or indirectly, whether as an owner, partner or employee, compete with Temps Plus, Inc., within a radius of seventy (70) miles from Blytheville, Arkansas." Dawson testified at trial that he did not remember reading the covenant when he signed the sale documents. Blytheville had at least four other temporary employment agencies at the time.

In March of 1997, Donald Ray Dawson started his own temporary employment business in Blytheville. On March 30, 1997, he hired two of Temps Plus's employees, Linda Ramsey and Melissa Trout, and began operation of Dawson Employment Agency. His temporary office was located at the local Holiday Inn. Over the next three days, Ramsey and Trout called potential temporary employees and contacted local companies that did business with Temps Plus to ask for their business. On April 2, 1997, Donald Ray Dawson received a certified letter from Lemons's attorney demanding that he cease operating a temporary employment agency in violation of the covenant not to compete. After consulting with his attorney, he immediately ceased doing business.

Two weeks later, Steve Dawson, appellant's brother, formed a corporation, Steve Dawson Employment Services, Inc. (hereinafter SDES), and went into the temporary employment business. He hired both Ramsey and Trout, paid for a computer program that his brother had ordered, and later rented office space in a building that his brother had built for his new business.

On April 23, 1997, Temps Plus sued Donald Ray Dawson, Steve Dawson, Linda Ramsey, Melissa Trout, and SDES for breach of contract, intentional interference with contractual relationships and business expectancies, theft of trade secrets, breach

of the duty of loyalty, and civil conspiracy. Temps Plus sought a preliminary and permanent injunction prohibiting Donald Ray Dawson, SDES or any other company "through which Donald Ray Dawson is associated and through which Donald Ray Dawson attempts to circumvent the Non-Competition Agreement" from competing with Temps Plus within a seventy-mile radius of Blytheville. It further requested an injunction against Ramsey and Trout from disclosing information detrimental to Temps Plus and sought damages and attorney's fees.

The various defendants filed counterclaims and motions to dismiss, and the case proceeded to trial. After six days of trial, the trial court upheld the covenant not to compete. The trial court pointed out that Donald Ray Dawson is the owner of several businesses, including a successful welding company that employs up to eighty-five people and was a customer of Temps Plus. The court determined that it was not unreasonable for Temps Plus to require a covenant not to compete in connection with the purchase of Dawson's stock, since Lemons and Dawson had been in business together for almost two years. The trial court reasoned that the agreement would reassure Temps Plus that Dawson would not go into a competing business in the area. The court also found that the agreement was reasonable as to time and scope and was entered into for a legitimate purpose.

The court permanently enjoined Donald Ray Dawson from further violations of the covenant not to compete and also enjoined him from providing financial assistance, business advice, advertising, promotion of services, or any other assistance to SDES. In addition to the breach of the covenant not to compete, the trial court found against Donald Ray Dawson on the counts alleging intentional interference with contractual relationships and business expectancies and civil conspiracy. The court further found for Temps Plus and against Linda Ramsey on the counts of breach of loyalty and civil conspiracy. It awarded Temps Plus $62,228.97 against Donald Ray Dawson for lost business. In a separate order, it awarded attorney's fees to Temps Plus totaling $20,270.00.

## *I. Covenant Not To Compete*

Donald Ray Dawson first claims that the non-compete covenant is unenforceable because no consideration was exchanged for the covenant. He also maintains that these facts are not those of a typical non-compete controversy where a business has been sold with ancillary goodwill or when an employee has left. Thus, he contends that the agreement was not necessary to protect Lemons's business and goodwill. He also takes issue with the covenant's time constraint of five years and its geographic scope which encompasses an area defined by a seventy-mile radius extending around Blytheville.

■ We review chancery cases *de novo* and do not reverse a finding of fact by the chancery court unless it is clearly erroneous. *See, e.g., Office of Child Support Enforcement v. Eagle*, 336 Ark. 51, 983 S.W.2d 429 (1999); *Clifford Family Ltd. Liability Co. v. Cox*, 334 Ark. 64, 971 S.W.2d 769 (1998).

■ Without statutory authorization or some dominant policy justification, a contract in restraint of trade is unreasonable if it is based on a promise to refrain from competition that is not ancillary to a contract of employment or to a contract for the transfer of goodwill or other property. *See Marshall v. Irby*, 203 Ark. 795, 158 S.W.2d 693 (1942). However, the law will not protect parties against ordinary competition. *See Orkin Extermination Co. v. Weaver*, 257 Ark. 926, 521 S.W.2d 69 (1975). Covenants not to compete in *employment* contracts are subject to stricter scrutiny than those connected with a *sale of a business*. *See Hyde v. C M Vending Co.*, 288 Ark. 218, 703 S.W.2d 862 (1986). The burden is on the party challenging the validity of a covenant to show that it is unreasonable and contrary to public policy. *See Madison Bank and Trust v. First Nat'l Bank*, 276 Ark. 405, 635 S.W.2d 268 (1982). We review cases involving covenants not to compete on a case-by-case basis. *See Evans Laboratories, Inc. v. Melder*, 262 Ark. 868, 562 S.W.2d 62 (1978).

■ Public policy favors competition and will not allow someone to buy off potential rivals and foreclose their competition in order to control a market where a promisee already participates in the business and a promisor does not. *See* John R. Pagan,

*Arkansas Courts and Covenants not to Compete*, 12 U. ARK. LITTLE ROCK L.J. 57, 61 (1989-90). In this regard, the court of appeals has emphasized that a covenant not to compete will not be enforced unless a covenantee has a legitimate interest to be protected by the agreement. *See Duffner v. Alberty*, 19 Ark. App. 137, 718 S.W.2d 111 (1986). The test is whether the restraint imposed is greater than is reasonably necessary to protect the covenantee and whether it injures the public interest. *See id.*

■ In the case at bar, the trial court found that even though Temps Plus was not Donald Ray Dawson's primary business, he had invested $40,000 in the agency and was associated with its operation. As an example, he used his business contacts in the community to promote Temps Plus and placed business cards at his welding shop to give to potential customers. He was fully informed about Temps Plus's financial status, and, ultimately, his initial investment of $40,000 yielded him $55,000 ($95,000 less the $35,100 promissory note and the $4,900 loan). We conclude, as did the trial court, that Lemons had a legitimate business interest to protect with the non-compete agreement. Donald Ray Dawson was a local businessman who had the wherewithal to start a new business. Furthermore, he knew the temporary agency business and how profitable it could be in Blytheville. He also needed temporary employees on occasion for his own welding business.

■ We turn then to the second facet of this point, which is the duration and scope of the covenant. Donald Ray Dawson contends that restrictions of more than two years are highly suspect and violative of public policy. He further claims that the seventy-mile radius is far too restraining. We begin our analysis by noting that there is nothing inherently unreasonable about a five-year duration restriction. *See Easley v. Sky, Inc.*, 15 Ark. App. 64, 689 S.W.2d 356 (1985). This court has upheld covenants not to compete lasting five years, ten years, twenty years, and without time limit. *See Hyde v. C M Vending Co., supra.* We are less likely to uphold a restriction that negatively affects a person's potential employment and ability to earn a livelihood. *See e.g., Miller v. Fairfield Bay, Inc.*, 247 Ark. 565, 446 S.W.2d 660 (1969) (refusing to enforce a three-year, fifty-mile covenant not to compete for a

real estate salesman); *United Ins. Agency v. Martin*, 258 Ark. 916, 529 S.W.2d 871 (1975) (holding a five-year, seventy-five-mile non-competition agreement invalid for an insurance salesman).

Again, we agree with the trial court that the geography and time constraints of the non-compete covenant were not unreasonable. Our caselaw has upheld restrictions with a five-year duration, and with respect to the geographical restriction, we conclude that it is reasonable under the circumstances. The seventy-mile radius covers territory where Temps Plus did business — Blytheville, Osceola, Manila, Paragould, and the cities of Hayti, Caruthersville, Malden, and Kennett in Missouri. Other courts have held that similar geographical restrictions are enforceable. *See Keeley v. Cardiovascular Surgical Assoc., P.C.*, 510 S.E.2d 880 (Ga. Ct. App. 1999) (seventy-five miles); *Midwest Television, Inc. v. Oloffson*, 699 N.E.2d 230 (Ill. Ct. App. 1998) (one hundred miles); *see also Easley v. Sky, supra*, in which our court of appeals upheld a one-hundred-mile restriction. Moreover, it proved to be an easy matter for Donald Ray Dawson to hire Temps Plus employees and use their experience and his knowledge of the business to begin a competing business. He opened a rival business in the same city within one year after agreeing not to do so.

Donald Ray Dawson also vigorously argues that he did not sell the goodwill of Temps Plus to Lemons and, therefore, the restrictive covenant should not be applied to him. Lemons retained the goodwill, he maintains, in an ongoing business. Thus, the covenant was not ancillary to the sale of goodwill in a business and is unenforceable under *Hyde v. C M Vending Co., supra*, and *Duffner v. Alberty, supra*.

We disagree. Donald Ray Dawson, as a businessman in the Blytheville community, transferred a substantial equity interest in the business to Lemons — 49%. He put up substantial capital to begin the fledgling business and was identified with the business in the community, though he did not engage in the day-to-day business operations. Under these facts, we cannot say that his sale of a 49% interest in the temp agency, which involved his substantial association with the business, did not involve the transfer of goodwill. *See Worldwide Auditing Services, Inc. v. Richter*, 587

A.2d 772 (Pa. Super. 1991) (Pennsylvania Supreme Court upheld and enforced restrictive covenant ancillary to the sale of ten percent of the stock in the company by an officer.)

## II.   Breach of the Covenant

Donald Ray Dawson next claims that he did not violate the restrictive covenant because he was never involved in a competing temporary employment business in Blytheville. He claims that he had no temporary employees register with him for work and that he had no customers. He adds that he took in no income and made no expenditures over the three-to-four-day period he was in operation.

We note, nevertheless, that the trial court found in its order that "[i]n March, 1997, Defendant, Donald Ray Dawson, began doing business as Dawson Employment Service and hired Defendants [Linda] Ramsey and [Melissa] Trout to work for him." Ramsey and Trout, of course, were hired away from Temps Plus. The trial court further found that Ramsey and Trout, while working for Donald Ray Dawson, "called and solicited the business of customers of Temps Plus, Inc." They also took applications from temporary employees who wished to work for Dawson Employment Service. The proof showed that he purchased equipment for the business and rented space in which to operate. He stopped operations only when he received the letter from the attorney for Temps Plus.

Though the temporary agency was in its embryonic stages, we cannot say that the trial court clearly erred in finding that Donald Ray Dawson violated the non-compete agreement. *See* Ark. R. Civ. P. 52(b). He had an office, employees, a business name, and equipment, and his employees were soliciting business customers from Temps Plus. We consider this to be enough to sustain the trial court's finding.

## III.   Damages

For his third point, Donald Ray Dawson urges that the damages of $62,228.97 awarded against him were excessive and that in

the event a breach was affirmed, only nominal damages were appropriate. We agree.

In general, damages recoverable for breach of contract are those damages which would place the injured party in the same position as if the contract had not been breached. *See Unigard Sec. Ins. Co. v. Murphy Oil USA, Inc.*, 331 Ark. 211, 962 S.W.2d 735 (1998); *Rebsamen Companies, Inc. v. Arkansas State Hosp. Employee Fed. Credit Union*, 258 Ark. 160, 522 S.W.2d 845 (1975). Damages must arise from the wrongful acts of the breaching party. *See* ARKANSAS LAW OF DAMAGES, § 4-5 (3d ed. 1996). Moreover, the judgment must have some relationship to the damages proved. *See Pennington v. Harvest Foods, Inc.*, 326 Ark. 704, 934 S.W.2d 485 (1996).

Consequential damages are defined as "[s]uch damage, loss or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act." *See Smith v. Walt Bennett Ford, Inc.*, 314 Ark. 591, 864 S.W.2d 817 (1993) (quoting *First Service Corp. v. Schumacher*, 16 Ark. App. 282, 702 S.W.2d 412 (1985)). Lost profits are recognized as a type of consequential damages. *See Smith v. Walt Bennett Ford, Inc., supra.* In breach-of-contract cases, consequential damages are recoverable when they were fairly within the contemplation of the parties. *See Shamburger v. Moody*, 322 F. Supp. 196 (E.D. Ark. 1970). Although recovery will not be denied merely because the amount of damages is hard to determine, damages must not be left to speculation and conjecture. *See Pennington v. Harvest Foods, Inc., supra; Morton v. Park View Apartments*, 315 Ark. 400, 868 S.W.2d 448 (1993).

In the instant case, the only breach of the covenant occurred during the three to four-day period when Donald Ray Dawson attempted to start a business — roughly March 30 through April 2, 1997. Because the two employees he hired from Temps Plus, Ramsey and Trout, were at-will employees, there was no breach of contract or wrongful conduct caused by that action. It is undisputed that even though he solicited customers, he did not obtain any business from Temps Plus customers during this brief period; nor did he sign up any of Temps Plus's temporary employees.

It is apparent that Temps Plus did not prove that any of the damages it alleged arose from this breach by Donald Ray Dawson. Instead, it focused on the later actions by Steve Dawson and customers lost by Temps Plus to SDES. The trial court found that these damages flowed directly from Donald Ray Dawson's actions because but for the opening of Don Dawson Employment Agency, Steve Dawson would not have opened SDES. The trial court also focused on the fact that Donald Ray Dawson leased a building to SDES.

■ We believe the trial court erred in this regard. Steve Dawson and SDES did not agree to a covenant not to compete with Temps Plus and were not in privity with Donald Ray Dawson. Thus, Steve Dawson and SDES were strangers to the contract, and any lost customers and profits incurred by Temps Plus due to competition by SDES were not the result of the breach of any contract by Donald Ray Dawson. *See St. Paul Fire and Marine Ins. v. Crittenden Abstract & Title Co.*, 255 Ark. 706, 502 S.W.2d 100 (1973). Furthermore, we do not view any lost business to SDES as a contingency contemplated by Lemons and Donald Ray Dawson at the time of the stock sale and the restrictive covenant so as to give rise to lost profits as damages. *See Shamburger v. Moody, supra.* Finally, we acknowledge that a non-signatory to a non-compete agreement may be bound under certain circumstances where the non-signatory conspired to breach a contract or acted in concert with the signatory to do so. *See Gold Messenger, Inc. v. McGuay*, 937 P.2d 907 (Colo. Ct. App. 1997); *Norlund v. Faust*, 675 N.E.2d 1142 (Ind. Ct. App. 1997). Here, though, the trial court did not find that Steve Dawson was bound by the restrictive covenant or acted as an alter ego for Donald Ray Dawson. It seems largely inconsistent for the trial court then to saddle Donald Ray Dawson for lost profits caused by a stranger to the contract.

■ In short, we conclude that damages flowing directly from any breach by Donald Ray Dawson during the three to four days of his business operation were not proved and are speculative at best. We reverse the trial court on this point.

*IV.  Attorney's Fees*

For his fourth argument, Donald Ray Dawson urges that the attorney's fee award of $20,270 was excessive. We agree. By law, the prevailing party is entitled to attorney's fees in breach-of-contract cases. *See* Ark. Code Ann. § 16-22-308 (Repl. 1994). The trial court initially awarded attorney's fees of $6,000 in an opinion letter, but in a later order, it reserved the issue for a subsequent hearing. By order dated April 24, 1998, the court awarded fees of $20,270 and stated in the order that it was taking the damages of $62,228.97 into consideration in awarding the higher fees.

We now have held that only nominal damages are appropriate in this case. Clearly, the fees awarded must be reviewed in that light as well as the other factors set out in *Chrisco v. Sun Indus.*, 304 Ark. 227, 800 S.W.2d 717 (1990). We reverse the fee award and remand to the trial court for reconsideration of appropriate fees in light of this opinion.

*V.  Cross-Appeal*

On cross-appeal, Temps Plus contends that there were sufficient facts for the trial court to extend the injunction to one or more of the remaining defendants. Temps Plus emphasizes that Donald Ray Dawson and Steve Dawson, either directly or indirectly, through the actions of Ramsey and Trout, have contacted virtually all of its customers and solicited their business. It further contends that Steve Dawson's business is the same as Donald Ray Dawson's four-day business, with the exception of the name. The two businesses had the same employees (Trout and Ramsey), the same location (Donald Ray Dawson's building), same bank, same credit line, same computer equipment and software, and it claims, the same customers.

The grant or denial of an injunction is generally a matter within the discretion of the chancery court, and we do not reverse the court unless there has been a clearly erroneous factual determination, or unless the decision is contrary to a rule of equity or the result of an improvident exercise of judicial power. *See Tri-County Funeral Serv. v. Eddie Howard Funeral Home*, 330

Ark. 789, 957 S.W.2d 694 (1997); *Warren v. Robinson*, 288 Ark. 249, 704 S.W.2d 614 (1986).

■ ■ We first observe that Temps Plus cites scarce legal authority in its brief to support this point and adduces no law on who may be restrained. It is axiomatic that a person who is not a party to a covenant not to compete is not liable for its breach. *See Hyde v. C M Vending Co., supra.* Furthermore, in order to establish sufficient grounds for a permanent injunction, the movant must show (1) that it is threatened with irreparable harm, (2) that this harm outweighs any injury which granting the injunction will inflict on other parties, (3) a likelihood of success on the merits, and (4) that the public interest favors the injunction. *See Arkansas Wildlife Federation v. Bekaert Corp.*, 791 F. Supp. 769 (W.D. Ark. 1992).

■ Temps Plus has not shown a likelihood of success on the merits and cannot show that the public interest favors the injunction. For one thing, we underscore again that only Donald Ray Dawson agreed to the covenant not to compete. Steve Dawson, SDES, Ramsey, and Trout never agreed to such a restriction with Temps Plus. Nor were they bound to the covenant by virtue of being in privity of contract with Donald Ray Dawson. *See, e.g., Taylor v. Dierks Lumber & Coal Co.*, 183 Ark. 937, 39 S.W.2d 724 (1931).

■ Finally, there was nothing to restrain Steve Dawson, SDES, and its employees from competing with Temps Plus. True, SDES may have been the successor business to Donald Ray Dawson's operation, but Temps Plus's covenant not to compete in no wise restricted SDES or its employees. Absent a restrictive agreement, this court will not shackle the privilege to engage in legitimate competition by extending a non-compete agreement to third parties. *See Vigoro Industries, Inc. v. Cleveland Chem. Co.*, 866 F.Supp. 1150 (E.D. Ark. 1994).

Affirmed in part. Reversed in part and remanded.

Affirmed on cross-appeal.